UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

RICKIA LITTLEJOHN,                         :
        Plaintiff,                       :
                                         :
        v.                               :     C.A. No. 15-336M
                                         :
CAROLYN W. COLVIN, ACTING                  :
COMMISSIONER OF SOCIAL SECURITY,           :
        Defendant.                       :

**REPORT AND RECOMMENDATION**

Patricia A. Sullivan, United States Magistrate Judge

      Plaintiff Rickia Littlejohn asks this Court to reverse the decision of the Commissioner of Social Security (the "Commissioner"), denying Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI") under §§ 205(g) and 1631(c)(3) of the Social Security Act, 42 U.S.C. §§ 405(g), 1383(c)(3) (the "Act").  He argues (1) that the failure of the Administrative Law Judge ("ALJ") to include in his hypothetical question to the Vocational Expert ("VE") the clarification that the ability to lift up to twenty pounds was "occasional" left the Step Five finding unsupported by substantial evidence; and (2) that the ALJ's residual functional capacity ("RFC")[1] findings were flawed because he interpreted a spinal x-ray and MRI without a medical source and because his decisions to discount both the treating opinion of Plaintiff's chiropractor and Plaintiff's credibility were not supported by substantial evidence.  Defendant Carolyn W. Colvin ("Defendant") has filed a motion for an order affirming the Commissioner's decision.

---

[1] Residual functional capacity is "the most you can still do despite your limitations," taking into account "[y]our impairment(s), and any related symptoms, such as pain, [that] may cause physical and mental limitations that affect what you can do in a work setting."  20 C.F.R. § 404.1545(a)(1).

This matter has been referred to me for preliminary review, findings and recommended disposition pursuant to 28 U.S.C. § 636(b)(1)(B).  Having reviewed the entire record, I find no material legal error and that the ALJ's findings are well supported by substantial evidence. Accordingly, I recommend that Plaintiff's Motion to Reverse the Decision of the Commissioner (ECF No. 11) be DENIED and Defendant's Motion for an Order Affirming the Decision of the Commissioner (ECF No. 12) be GRANTED.

## I.    Background Facts

### A.    Plaintiff's Relevant Background

On August 17, 2012, Plaintiff protectively filed for disability that he claims began on April 1, 2012, due to a left foot impairment, a right Achilles tendon impairment, and the effects of childhood meningitis.[2]  Tr. 66-67.  After reconsideration was denied but before the ALJ's hearing, he claimed to have been hit by a car while riding a bike, resulting in a lumbar spine injury, which he added to his claim.  Tr. 338-39.  Plaintiff was fifty-one at onset and lives in an apartment.  Tr. 41.  Beyond that, the record regarding Plaintiff's relevant background, including what Plaintiff really did for work prior to onset, what are Plaintiff's real activities of daily living, what is Plaintiff's real educational background, and how Plaintiff really came to be injured, is replete with troubling inconsistencies.

The anomalies infecting the evidence of Plaintiff's work history are exposed by contrasting the prior employment information from third party sources with employment

---

[2] Plaintiff included this as one of his claimed impairments, but submitted no evidence establishing that he ever had meningitis or that it caused any functional limitations.  See Tr. 66.  At the hearing, Plaintiff's counsel conceded that "[i]t's not developed in this record."  Tr. 51.  The ALJ correctly rejected it at Step Two.  Tr. 21.  It will play no further role in this report and recommendation, except that Plaintiff's inclusion of it as a disabling impairment, juxtaposed with the submission of nothing to support such a claim, may be taken into consideration with respect to credibility.  Figueroa v. Colvin, No. CV 12-06742-OP, 2013 WL 1859073, at *7 (C.D. Cal. May 2, 2013) (ALJ based his credibility finding in part on the fact that there was no evidence to support three of plaintiff's alleged impairments); see also Jenkins v. Colvin, No. EDCV 14-1796-JPR, 2015 WL 4208517, at *5 (C.D. Cal. July 10, 2015) (lack of evidence is proof that plaintiff's contentions lack merit).

information from Plaintiff.  For starters, Plaintiff's earnings record reflects intermittent work, yielding relatively low income when he was working.  From 2008 until 2012, these records reflect that he worked for "Middlesex Cleaning;" from 2008 until 2011, he earned between $8,000 to $12,000, while in 2012, he earned $1,200.  Tr. 189-95.  In 2012, the record reflects that he also worked for Laundry Management Services, Inc., which paid him $125, while in 2011, he was paid $3,000 by BCD Enterprises and, in 2008, he was paid $60 by Preferable People, LLC. Tr. 188-95.  According to these records, in 2007, he had no income; in 2006, he earned $11,000 working for D. Corso Excavating, Inc., and Preferred Labor, LLC; in 2004 and 2005, he earned less than $7000 in each year.  Tr. 189, 195.  From 2003 back to 1990, he had almost no income at all.  Tr. 189.

This objective information cannot be harmonized with the information Plaintiff provided in connection with his disability application: in a Work History Report, he wrote that he worked at "Middlesex Engineering" (not Middlesex Cleaning, the entity that reported paying him wages) from June 11, 1990, until April 1, 2012 (not from 2008 to 2012, as the earnings record reflects). Tr. 228.  Plaintiff described this job as supervisory and involving the repair of engines on the top of hotels and requiring technical knowledge and skills.  Tr. 229.  Based on the rate of pay he wrote in the Report, Plaintiff would have earned close to $60,000 per year (far more than the earnings of up to $12,000 in the earnings report).  See Tr. 229.  In another Work History Report, apparently completed by counsel on Plaintiff's behalf, he indicated that he had worked as a "window cleaner" in connection with construction from 1992 until April 2012, also earning at the rate of approximately $60,000 per year.  Plaintiff testified to yet another version of his prior work at the hearing – he claimed to have been working as a foreman for "Middlesex

Hydraulics," performing hydraulic-related troubleshooting for earth movers and heavy-duty construction equipment.[3]  Tr. 42.

Also puzzling is Plaintiff's presentation of two variations of his daily activities in two quite different Function Reports that were filled out almost contemporaneously.  Tr. 220-32, 233-48.  The first was signed on September 9, 2012, and appears to have been entirely filled in by Plaintiff himself; the second was signed on September 28, 2012, less than three weeks later and purports to have been completed by "Rickia Littlejohn/Green & Greenberg."  Tr. 227, 232, 240, 248.  One report says that Plaintiff drives, Tr. 223, while the other says that he does not, Tr. 236.  One says he lives in an apartment with family; the other says he lives with a friend.  Tr. 220, 233.  One says he cares for no one; the other says he cares for his grandson, including getting him up and making his meals.  Tr. 221, 234.  One says that, at least two days a week, he cannot get out of bed due to pain and depression; the other makes no such reference.  Tr. 234. One says he prepares daily meals, vacuums, cleans, does laundry, and washes dishes with breaks as needed; the other says that he prepares meals, but the need to elevate his leg interferes with any other activities.  Tr. 222, 235.  One says he goes out "a lot" on foot or on public transportation, shops and can handle money; the other says he only tries to get out daily and cannot pay bills or handle either a savings account or the use of checks or money orders.  Tr. 223, 236.  One says that he regularly attends church and goes to the library and a men's club, while the other lists no places attended regularly because he tends to stay to himself.  Tr. 224, 237-38.  One says he has no problems with attention or following instructions, takes stress in stride and welcomes change, while the other says he does not deal well with stress and has difficulty with attention and spoken instructions.  Tr. 225-26, 238-39.  One says he must elevate

---

[3] When the ALJ asked him about the earnings report, which listed Middlesex Cleaning, not Middlesex Hydraulics, as his employer, Plaintiff responded, "Yes, we cleaned up.  That's what we did.  We cleaned up a lot of the job sites, made sure the machinery was cleaned up, made sure all the . . . ."  Tr. 42.

his legs six to seven times per day for an hour to an hour and a half (a requirement not reflected in any medical record); the other makes no reference to such a limitation.  Tr. 233.

Plaintiff's educational background is also mysterious.  At the hearing, Plaintiff's counsel explained that he dropped out of high school in the tenth grade and later got a GED.  Tr. 39. During the clinical interview with Dr. Turchetta, Plaintiff claimed to have finished high school in California and to have completed two and a half years of college at the University of California. Tr. 309; see Tr. 214 (completed two years of college).  He also claims to have completed specialized training in hydraulic engineering in the 1990s.  Tr. 214.

The greatest mystery of all is what caused the injuries to the left foot, the right ankle and the lumbar spine, which are the primary impairments allegedly causing disability.  Over the period from April 2012, when he stopped work, until just prior to the hearing in November 2013, Plaintiff has told many different versions of the story.

The tale begins with Plaintiff's left foot – on April 1, 2012 (the alleged onset date), at the Rhode Island Hospital ("RIH") emergency room, he reported "stepping on tree branch yesterday wearing slippers in backyard of his house" and that "something in the yard that came up thru my shoe"; the injury caused a puncture wound and a fractured metatarsal.  Tr. 279, 282-83.  The next event affects Plaintiff's right ankle – three months after seeking care for the left foot, on July 3, 2012, Plaintiff's ankle was x-rayed at Cambridge Hospital because of his complaint of "[r]ight Achilles pain and swelling."  Tr. 300.  A few days later, on July 6, 2012, Plaintiff saw Dr. Launer of Cambridge Health Alliance who diagnosed right Achilles tendon rupture, subacute, and recommended nonsurgical treatment because the injury was already at least one month old.[4]  Tr.

---

[4] Dr. Launer made a point of noting that, "we do not have an exact date of his injury to the right Achilles."  Tr. 297.

298.  Notably, Plaintiff told Dr. Launer that the right ankle had been injured at work[5] "because the equipment was malfunctioning."  Id.  During this appointment, Plaintiff asked Dr. Launer if he could collect disability for the right ankle injury and was told that was unlikely.  Id.  Plaintiff terminated treatment of the right ankle with Dr. Launer on October 18, 2012, because he was moving to Rhode Island; at the final appointment, Dr. Launer noted that the foot and ankle showed no swelling and recommended that Plaintiff stop wearing the splint and postop shoe and transition to normal footwear.  Tr. 291.  According to a letter from Dr. Launer's colleague, Ka-Yi Lo, Plaintiff was able to return to work as of that date.  Tr. 375.

Meanwhile, while going to Cambridge for his right ankle, care for the left foot resumed in Rhode Island (after several missed follow-up appointments),[6] with Dr. Raymond Hsu of the RIH orthopedics clinic.  On August 24, 2012; Plaintiff complained to Dr. Hsu of pain; this time, in contrast to the story told at the emergency room of walking in slippers in the back yard, he told Dr. Hsu that the left foot puncture and fracture had been caused by a "fall from construction at work onto bushes."  Tr. 425.  Noting that the fracture had healed, Dr. Hsu cleared Plaintiff to work as limited by pain.  Tr. 275.  In November 2012, Dr. Hsu discovered that some of the splinter remained under the skin and surgically removed it.  Tr. 314.  By December 2012, the wound was healed, pain medication was discontinued, and Plaintiff was told to wear a normal shoe and was discharged from further treatment.  Tr. 313-14.

During this period, care for the right ankle (ended at Cambridge Hospital in October) switched to Rhode Island on December 3, 2012, at the Elmwood Orthopedic Rehab Center.  Tr. 332.  By contrast with the story of a work-place encounter with malfunctioning equipment told to

---

[5] If Plaintiff's testimony about when he stopped working is true, this statement is false – Plaintiff has consistently claimed that he stopped working on April 1, 2012, the date of alleged onset, and the earnings record confirms that.

[6] According to the record, the left foot was not treated after the April 1, 2012, emergency room visit until August 24, 2012, when Plaintiff first saw Dr. Hsu.

Dr. Launer, Plaintiff told Elmwood staff that the right ankle was injured when he fell ten feet from a ladder in late March 2012.  Tr. 332.  Based on a physical examination, they opined that, with appropriate physical therapy, Plaintiff should be able to walk and run for two hours daily for occupational and athletic activities within eight weeks.  Tr. 333-34.

While Plaintiff was giving these explanations to treating providers, he provided a very different story in connection with his disability application; soon after filing for disability, on September 9, 2012, he completed a Function Report in which he conflated the cause of the injury to the left foot (both the puncture and the fracture) and to the right ankle (the Achilles rupture), stating that "both" were injured in the same incident "when I fell at work."  Tr. 227.

For four months following Dr. Hsu's termination of treatment for the left foot based on it being fully healed and Elmwood's opinion that the right ankle would fully recover with eight weeks of rehabilitation treatment, there is a gap during which Plaintiff appears to have received no treatment (including no physical therapy) for either the left foot or the right ankle. Meanwhile on December 4, 2012, his disability claim was denied initially, Tr. 88-89, and on April 24, 2013, it was denied on reconsideration, Tr. 116-17.

The treatment lapse ended just before the reconsideration denial, on April 18, 2013, when Plaintiff went to the RIH emergency room complaining of pain in both the left foot and right ankle.  Tr. 416.  At this appointment, Plaintiff's statement to the attending physician (contrary to prior statements to treating providers but consistent with the disability application) conflated the occurrence of the two injuries, reporting that "one year ago [he] fell from . . . a height, and sustained a left ankle fracture as well as a right Achilles tendon rupture . . . normally works as a high-rise window washing foreman."  Tr. 417.  Finding no sign of infection or complication, the nurse practitioner acquiesced to Plaintiff's request for a prescription for pain medication and an

out-of-work note just until he could make an appointment with an orthopedist.  Id.  In May 2013,

Plaintiff returned to Dr. Hsu at the RIH orthopedic clinic.  Tr. 419.  Dr. Hsu urged Plaintiff to

continue range of motion and strengthening exercises for the right ankle and to stop use of the

splint; he referred Plaintiff for a neuropathy workup because he considered the injury is unlikely

to cause the pain he was complaining about.  Id.

        Plaintiff's medical situation shifted on June 14, 2013, when Plaintiff went to the Kent

Hospital emergency room claiming that he had been hit by a car while biking.  Tr. 361.  Based

on his statement that he hit his head, twisted his back and his right foot was run over, x-rays were

taken of his brain, back and right foot/ankle, all of which resulted in no acute findings.  Tr. 365.

On physical examination, the emergency room physician found no tenderness and normal range

of motion in the back and mild tenderness and normal range of motion in the ankle and foot.  Id.

Plaintiff was discharged home apparently without medication or follow up instructions.  Id.

        Two weeks after the bike collision, on June 28, 2013, Plaintiff initiated care with a

chiropractor, Dr. Stephen Estner.  Dr. Estner's initial assessment stated that Plaintiff had been

asymptomatic at the time of the bike collision and that acute lumbosacral sprain, post-traumatic

headaches and an acute right ankle sprain were all caused by the collision.  Tr. 338-39.  Until

mid-August, Plaintiff saw Dr. Estner every few days for a range of chiropractic treatments,

including moist heat, laser therapy, electrical muscle stimulation and chiropractic manipulation.

Tr. 341-47.  At each appointment, the Estner notes reflect that Plaintiff could not put any weight

on the right ankle and that the pain either stayed the same or got worse.  On July 19, 2013, Dr.

Estner signed a revised opinion because "the patient informed me of a work-related injury that

occurred on April 1, 2012, where he fell at work, fracturing his left foot and rupturing his right

Achilles tendon."  Tr. 344.  The new opinion concludes that the bike collision exacerbated the

8

prior injury to the right ankle.  Id.  A little over a month later, on August 30, 2013, Plaintiff

ended treatment with Dr. Estner because his lumbar spine, right ankle and left foot were "no

longer experiencing relief."  Tr. 348.

Also in June 2013, Plaintiff began treatment at the Rhode Island Free Clinic, which did

not prescribe medication or other treatment, but did refer him to a neurologist, Dr. Elaine Jones,

as Dr. Hsu had recommended.  Tr. 355.  After lumbar spine and right ankle MRIs were

completed in July 2013,[7] Dr. Jones saw Plaintiff on August 26, 2013.  Tr. 357.  Plaintiff told her

how he injured both feet and his back, now conflating all three injuries into a single incident –

according to this version:

> About six months ago he was working on the side of a building and coming down
> in a chair suspended by ropes.  One rope slipped and he fe[l]l to the ground,
> hitting his right foot on a machine and twisting his back . . . .  [H]e ruptured his
> right Achilles tendon and broke a bone in the left foot."

Tr. 357.  He claimed he was admitted to RIH as a result of this serious injury.[8]  Dr. Jones

examined the lumbar spine MRI and found "no obvious disc issues."  Id.  She did not

recommend any back treatment but did order EMG testing; at her final appointment with

Plaintiff on October 21, 2013, she found EMG results "relatively unremarkable" and ordered no

treatment of the back, foot or ankle, except for a low dose of pain medication.  Tr. 359.  She

suggested follow up in two to three months.  Id.  With the neurologic testing done, Plaintiff

returned to Dr. Hsu on October 23, 2013.  Dr. Hsu prescribed no medication and discontinued

treatment based on the findings that Plaintiff's left foot injury was fully resolved, resulting in

---

[7] The MRI of Plaintiff's lumbar spine showed a disc bulge with mild central stenosis and a left lateral annular tear at L3-4 and multilevel foraminal narrowing.  Tr. 351-52.  The MRI of the right ankle showed Achilles hypertrophic tendinopathy without evidence of tendinous or ligamentous tear or fracture.  Tr. 353-54.

[8] Based on the records provided by RIH, this is false.

"[w]alking without assist or AFO (ankle/foot orthotic)," and that the right ankle continues to have some weaknesses but he is "able to ambulate without assist[ance]."[9]  Tr. 438.

With such a dramatic inconsistency among the five (at least) different versions of Plaintiff's story of how he hurt his foot and ankle, the only thing that can be said with certainty is that no one (except Plaintiff himself) knows what really happened in early April 2012, as a result of which, as Plaintiff now claims, he could no longer work.  This mystery drew the Court's attention to three references in the record: (1) the statement in the application that "I have been accused or convicted of a felony" and that the matter is "continuing"; (2) the 2006 treating note indicating that Plaintiff was receiving substance abuse treatment after serving two and a half years in prison for beating his former girlfriend and her male friend; and (3) Dr. Hsu's May 3, 2013, note ("[h]as a pending legal issue which pt would like a note stating he would not have been able to run with bilateral foot/ankle injuries"), which Plaintiff dismissed as "an incident I had with an ex-girlfriend and it's all over with," when questioned about it by the ALJ.  Tr. 51, 174, 273, 420.  Based on these references, the Court accessed the public records for the Rhode Island state court's criminal docket.

This public record search revealed that, on April 17, 2012, just two weeks after the alleged onset of disability, Plaintiff was charged by the State of Rhode Island with felonious breaking and entering a dwelling/domestic, stalking/domestic, and wilful trespass.  See http://courtconnect.courts.state.ri.us/pls/ri_adult/ck_public_qry_doct.cp_dktrpt_frames?backto=P &case_id=62-2012-04804&begin_date=&end_date= (reviewed Sept. 15, 2016).  Further, a contemporaneous online media report from April 18, 2012, states that "Littlejohn Rickia, 51, was

---

[9] When the ALJ asked Plaintiff why he was still using a cane when Dr. Hsu had opined that both feet were sufficiently healed to permit ambulation without such assistance, Plaintiff responded, "I'm going to another doctor that's saying something different," referring to Dr. Jones.  Tr. 50.  Dr. Jones's treating records put the lie to this assertion.  See Tr. 357-59.

charged with domestic breaking and entering, stalking and trespassing, after he used a ladder to enter a second story and scaled a fence to flee the scene.  "Man Uses Ladder to Break Into Woodward Avenue Home," East Providence Patch, http://patch.com/rhode-island/eastprovidence/man-uses-ladder-to-break-into-woodward-avenue-home (reviewed Sept. 15, 2016).  And the Rhode Island Adult Criminal Information Database website establishes that in late May 2013, shortly after Plaintiff asked Dr. Hsu for a note saying he could not run, his criminal case was passed for trial in the Superior Court; in September 2013, he pled nolo contendere and was sentenced to ten years, with sixty days to serve.  See http://courtconnect.courts.state.ri.us/pls/ri_adult/ck_public_qry_doct.cp_dktrpt_frames?backto=P&case_id=P2-2012-1930ADV&begin_date=&end_date= (reviewed Sept. 15, 2016).

Without accepting the truth of any of this information, the Court is nevertheless compelled to question whether this case might implicate the principle that an impairment caused during the course of committing a felony may not be considered in making a disability determination.  42 U.S.C. § 423(d)(6)(A) ("any physical or mental impairment which arises in connection with the commission by an individual . . . of an offense which constitutes a felony under applicable law and for which such individual is subsequently convicted . . . shall not be considered in determining whether an individual is under a disability"); see 20 C.F.R. § 404.1506(a) (same).  Put differently, these references suggest a serious question: were any or all of Plaintiff's injuries caused by a fall from a ladder or a vault over a fence in the course of committing the felony of breaking and entering in April 2012?  Mindful that the ALJ did not address this question nor has it been raised or briefed by either party, I merely ask the question, but make no findings and draw no conclusions.  See Fowler v. Comm'r of Soc. Sec., No. 12–12637, 2013 WL 5372883, at *3 & n.5 (E.D. Mich. Sept. 25, 2013) (court may, and should, raise

issues *sua sponte* when review of record suggests that justice requires it); Silva v. Colvin, No.

CA 14-301 S, 2015 WL 5023096, at *13 (D.R.I. Aug. 24, 2015) (same).

Because, for the reasons discussed below, I am recommending that the Commissioner's

motion to affirm be granted based on the ample record evidence supporting the ALJ's decision,

whether this case involves felony-related impairments becomes pertinent only if this Court

disagrees with my recommendation.  If this Court remands the matter, I strongly recommend that

the remand include a directive that further consideration should be given to whether any of the

impairments are felony-related.  See SSR 83-21, Person Convicted of a Felony, 1983 WL 31258

(Jan. 1, 1983).

### B.      Opinion Evidence

On December 3, 2012, SSA consulting physician Dr. Stephanie Green reviewed the

record and opined that Plaintiff could occasionally lift and carry up to fifty pounds, frequently

lift and carry up to twenty-five pounds and stand, walk or sit for six hours in an eight-hour

workday, with limits on the use of right foot controls and climbing ramps, stairs, ladders, ropes,

and scaffolds.  Tr. 73.  On the same day, SSA consulting psychologist Dr. John Warren

considered the examining report of consulting psychologist Dr. Louis Turchetta in the context of

the balance of the record and opined that Plaintiff has no severe mental impairments.  Tr. 70-72.

The examiners opined that Plaintiff's statements about his symptoms were only partially

credible.  Tr. 72.

At the reconsideration phase, on April 24, 2013, SSA reviewing physician Dr. Kenneth

Nanian agreed with Dr. Green's RFC, except that he opined to greater postural limitation.  Tr.

98-99.  Dr. Nanian noted that Plaintiff's lack of recovery of range of motion in the right ankle

appeared to be related to Plaintiff's failure to follow up on the recommendation that he engage in

physical therapy and his persistent use of a splint.  Tr. 99.  SSA psychologist Dr. Janet Telford-Tyler affirmed Dr. Warren's conclusion of no severe mental impairments.  Tr. 96-97.  The reviewers assessed Plaintiff's statements regarding his symptoms only partially credible.  Tr. 98.

On November 4, 2013, based on the July 2013 MRI that Dr. Jones found to show "no disc issues," confirmed by a spinal EMG that was "relatively unremarkable," Dr. Estner signed an opinion concluding that Plaintiff's moderately severe pain from a lumbar spine L3-4 annular tear and stenosis precluded the sustained concentration and productivity needed for full time employment and would cause Plaintiff to be off task for at least one hour a day and absent from work more than four days per month.  Tr. 336.  Although Dr. Estner noted that Plaintiff's right ankle MRI was negative, contrary to Dr. Hsu's October 2013 opinion that Plaintiff could ambulate without assistance or aids, Tr. 438, he opined that Plaintiff could not stand or walk at all; he also found that Plaintiff could sit for only four hours and could lift or carry twenty pounds frequently and twenty-five pounds occasionally with postural and other limitations.  Tr. 337.  Although Dr. Estner signed the form on November 4, 2013, he wrote that he had not actually seen Plaintiff at all since August 30, 2013.  Tr. 337.  Dr. Estner also submitted his June 28, 2013, opinion which links all of Plaintiff's impairments and more to the bike collision and his July 19, 2013, alteration of his medical opinion based on Plaintiff's statement to him that the left foot and right ankle were both injured in an April 2012 work-related fall.  Tr. 344

## II.     Travel of the Case

Plaintiff applied for DIB and SSI, alleging disability beginning April 1, 2012.  Tr. 66.  Plaintiff's applications were denied initially, Tr. 88-89, and on reconsideration, Tr. 116-17.  At a hearing on November 21, 2013, Plaintiff, represented by an attorney, and a VE testified.  Tr. 34-35.  On January 30, 2014, the ALJ issued a decision finding that Plaintiff was not disabled within

the meaning of the Act from his alleged onset date through the date of the decision.  Tr. 14-28.

On June 8, 2015, the Appeals Council denied Plaintiff's request for review, Tr. 1-3, making the

ALJ's decision the Commissioner's final decision subject to judicial review.  42 U.S.C. § 405(g).

## III.     Issues Presented

Plaintiff's motion for reversal rests on two arguments – that the ALJ's finding at Step

Five is not supported by substantial evidence and that the ALJ's RFC finding is not supported by

substantial evidence.  The latter argument is based on Plaintiff's challenge to the ALJ's rejection

of Dr. Estner's opinion as worthy of "minimal/less probative weight" and to the ALJ's

determination that Plaintiff's statements were "not entirely credible."  Tr. 21, 25.

## IV.     Standard of Review

The Commissioner's findings of fact are conclusive if supported by substantial evidence.

42 U.S.C. § 405(g).  Substantial evidence is more than a scintilla – that is, the evidence must do

more than merely create a suspicion of the existence of a fact, and must include such relevant

evidence as a reasonable person would accept as adequate to support the conclusion.  Ortiz v.

Sec'y of Health & Human Servs., 955 F.2d 765, 769 (1st Cir. 1991) (per curiam); Rodriguez v.

Sec'y of Health & Human Servs., 647 F.2d 218, 222 (1st Cir. 1981); Brown v. Apfel, 71 F.

Supp. 2d 28, 30 (D.R.I. 1999).  Once the Court concludes that the decision is supported by

substantial evidence, the Commissioner must be affirmed, even if the Court would have reached

a contrary result as finder of fact.  Rodriguez Pagan v. Sec'y of Health & Human Servs., 819

F.2d 1, 3 (1st Cir. 1987); see also Barnes v. Sullivan, 932 F.2d 1356, 1358 (11th Cir. 1991);

Lizotte v. Sec'y of Health & Human Servs., 654 F.2d 127, 128 (1st Cir. 1981).

The determination of substantiality is based upon an evaluation of the record as a whole.

Brown, 71 F. Supp. 2d at 30; see also Frustaglia v. Sec'y of Health & Human Servs., 829 F.2d

192, 195 (1st Cir. 1987); <u>Parker v. Bowen</u>, 793 F.2d 1177, 1180 (11th Cir. 1986) (court also must consider evidence detracting from evidence on which Commissioner relied).  Thus, the Court's role in reviewing the Commissioner's decision is limited.  <u>Brown</u>, 71 F. Supp. 2d at 30. The Court does not reinterpret the evidence or otherwise substitute its own judgment for that of the Commissioner.  <u>Id.</u> at 30-31 (citing <u>Colon v. Sec'y of Health & Human Servs.</u>, 877 F.2d 148, 153 (1st Cir. 1989)).  "[T]he resolution of conflicts in the evidence is for the Commissioner, not the courts."  <u>Id.</u> at 31 (citing <u>Richardson v. Perales</u>, 402 U.S. 389, 399 (1971)).  A claimant's complaints alone cannot provide a basis for entitlement when they are not supported by medical evidence.  <u>See</u> <u>Avery v. Sec'y of Health & Human Servs.</u>, 797 F.2d 19, 20-21 (1st Cir. 1986); 20 C.F.R. § 404.1529(a).

The Court must reverse the ALJ's decision on plenary review, if the ALJ applies incorrect law, or if the ALJ fails to provide the Court with sufficient reasoning to determine that the law was applied properly.  <u>Nguyen v. Chater</u>, 172 F.3d 31, 35 (1st Cir. 1999) (per curiam); <u>accord</u> <u>Cornelius v. Sullivan</u>, 936 F.2d 1143, 1145-46 (11th Cir. 1991).  Remand is unnecessary where all of the essential evidence was before the Appeals Council when it denied review, and the evidence establishes without any doubt that the claimant was disabled.  <u>Seavey v. Barnhart</u>, 276 F.3d 1, 11 (1st Cir. 2001) (citing <u>Mowery v. Heckler</u>, 771 F.2d 966, 973 (6th Cir. 1985)).

The Court may remand a case to the Commissioner for a rehearing under Sentence Four of 42 U.S.C. § 405(g); under Sentence Six of 42 U.S.C. § 405(g); or under both sentences. <u>Jackson v. Chater</u>, 99 F.3d 1086, 1097-98 (11th Cir. 1996).

To remand under Sentence Four, the Court must either find that the Commissioner's decision is not supported by substantial evidence, or that the Commissioner incorrectly applied the law relevant to the disability claim.  <u>Seavey</u>, 276 F.3d at 9; <u>accord</u> <u>Brenem v. Harris</u>, 621

F.2d 688, 690 (5th Cir. 1980) (remand appropriate where record was insufficient to affirm, but also was insufficient for district court to find claimant disabled). Where the Court cannot discern the basis for the Commissioner's decision, a Sentence Four remand may be appropriate to allow an explanation of the basis for the decision. Freeman v. Barnhart, 274 F.3d 606, 609-10 (1st Cir. 2001). On remand under Sentence Four, the ALJ should review the case on a complete record, including any new material evidence. Diorio v. Heckler, 721 F.2d 726, 729 (11th Cir. 1983) (necessary for ALJ on remand to consider psychiatric report tendered to Appeals Council). After a Sentence Four remand, the Court enters a final and appealable judgment immediately, and thus loses jurisdiction. Freeman, 274 F.3d at 610.

## V.    Disability Determination

The law defines disability as the inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months. 42 U.S.C. § 416(I); 20 C.F.R. § 404.1505. The impairment must be severe, making the claimant unable to do previous work, or any other substantial gainful activity which exists in the national economy. 42 U.S.C. § 423(d)(2); 20 C.F.R. §§ 404.1505-1511.

### A.    Treating Physicians and Other Sources

Substantial weight should be given to the opinion, diagnosis and medical evidence of a treating physician unless there are good reasons to do otherwise. See Rohrberg v. Apfel, 26 F. Supp. 2d 303, 311 (D. Mass. 1998); 20 C.F.R. § 404.1527(c). If a treating physician's opinion on the nature and severity of a claimant's impairments is well-supported by medically acceptable clinical and laboratory diagnostic techniques, and is not inconsistent with the other substantial evidence in the record, the ALJ must give it controlling weight. Konuch v. Astrue, No. 11-193L,

2012 WL 5032667, at *4-5 (D.R.I. Sept. 13, 2012); 20 C.F.R. § 404.1527(c)(2).  The ALJ may

discount a treating physician's opinion or report regarding an inability to work if it is

unsupported by objective medical evidence or is wholly conclusory.  See Keating v. Sec'y of

Health & Human Servs., 848 F.2d 271, 275-76 (1st Cir. 1988).  The ALJ's decision must

articulate the weight given, providing "good reasons" for the determination.  See Sargent v.

Astrue, No. CA 11–220 ML, 2012 WL 5413132, at *7-8, 11-12 (D.R.I. Sept. 20, 2012) (where

ALJ failed to point to evidence to support weight accorded treating source opinion, court will not

speculate and try to glean from the record; remand so that ALJ can explicitly set forth findings).

Where a treating physician has merely made conclusory statements, the ALJ may afford

them such weight as is supported by clinical or laboratory findings and other consistent evidence

of a claimant's impairments.  See Wheeler v. Heckler, 784 F.2d 1073, 1075 (11th Cir. 1986).

When a treating physician's opinion does not warrant controlling weight, the ALJ must

nevertheless weigh the medical opinion based on the (1) length of the treatment relationship and

the frequency of examination; (2) nature and extent of the treatment relationship; (3) medical

evidence supporting the opinion; (4) consistency with the record as a whole; (5) specialization in

the medical conditions at issue; and (6) other factors which tend to support or contradict the

opinion.  20 C.F.R § 404.1527(c).  However, a treating physician's opinion is generally entitled

to more weight than a consulting physician's opinion.  See 20 C.F.R. § 404.1527(c)(2).

A treating source who is not a licensed physician or psychologist is not an "acceptable

medical source."  20 C.F.R. § 404.1513; SSR 06-03p, 2006 WL 2263437, at *2 (Aug. 9, 2006).

Only an acceptable medical source may provide a medical opinion entitled to controlling weight

to establish the existence of a medically determinable impairment.  SSR 06-03p, 2006 WL

2263437, at *2.  An "other source," such as a chiropractor or nurse practitioner, is not an

"acceptable medical source," and cannot establish the existence of a medically determinable impairment, though such a source may provide insight into the severity of an impairment, including its impact on the individual's ability to function. Id. at *2-3; 20 C.F.R. § 404.1513(d), 416.913(d) BOTH?. In general, an opinion from an "other source" is not entitled to the same deference as an opinion from a treating physician or psychologist. Id. at *5. Nevertheless, the opinions of medical sources who are not "acceptable medical sources" are important and should be evaluated on key issues such as severity and functional effects, along with other relevant evidence in the file. Id. at *4.

The ALJ is required to review all of the medical findings and other evidence that support a medical source's statement that a claimant is disabled. However, the ALJ is responsible for making the ultimate determination about whether a claimant meets the statutory definition of disability. 20 C.F.R. § 404.1527(d). The ALJ is not required to give any special significance to the status of a physician as treating or non-treating in weighing an opinion on whether the claimant meets a listed impairment, a claimant's residual functional capacity ("RFC"), see 20 C.F.R. § 404.1545-1546, or the application of vocational factors because that ultimate determination is the province of the Commissioner. 20 C.F.R. § 404.1527(d); see also Dudley v. Sec'y of Health & Human Servs., 816 F.2d 792, 794 (1st Cir. 1987) (per curiam).

### B. The Five-Step Evaluation

The ALJ must follow five steps in evaluating a claim of disability. See 20 C.F.R. § 404.1520. First, if a claimant is working at a substantial gainful activity, the claimant is not disabled. 20 C.F.R. § 404.1520(b). Second, if a claimant does not have any impairment or combination of impairments that significantly limit physical or mental ability to do basic work activities, then the claimant does not have a severe impairment and is not disabled. 20 C.F.R. §

404.1520(c).  Third, if a claimant's impairments meet or equal an impairment listed in 20 C.F.R.

Part 404, Appendix 1, the claimant is disabled.  20 C.F.R. § 404.1520(d).  Fourth, if a claimant's

impairments do not prevent doing past relevant work, the claimant is not disabled.  20 C.F.R. §

404.1520(e)-(f).  Fifth, if a claimant's impairments (considering RFC, age, education and past

work) prevent doing other work that exists in the local or national economy, a finding of disabled

is warranted.  20 C.F.R. § 404.1520(g).  Significantly, the claimant bears the burden of proof at

Steps One through Four, but the Commissioner bears the burden at Step Five.  Wells v. Barnhart,

267 F. Supp. 2d 138, 144 (D. Mass. 2003).

      In determining whether a claimant's physical and mental impairments are sufficiently

severe, the ALJ must consider the combined effect of all of the claimant's impairments and must

consider any medically severe combination of impairments throughout the disability

determination process.  42 U.S.C. § 423(d)(2)(B).  Accordingly, the ALJ must make specific and

well-articulated findings as to the effect of a combination of impairments when determining

whether an individual is disabled.  Davis v. Shalala, 985 F.2d 528, 534 (11th Cir. 1993).

The claimant must prove the existence of a disability on or before the last day of insured status

for the purposes of disability benefits.  Deblois, 686 F.2d at 79; 42 U.S.C. § 416(i)(3).  If a

claimant becomes disabled after loss of insured status, the claim for disability benefits must be

denied despite disability.  Cruz Rivera v. Sec'y of Health & Human Servs., 818 F.2d 96, 97 (1st

Cir. 1986).

      **C.**    **Making Credibility Determinations**

      Where an ALJ decides not to credit a claimant's testimony, the ALJ must articulate

specific and adequate reasons for doing so, or the record must be obvious as to the credibility

finding.  See Da Rosa v. Sec'y of Health & Human Servs., 803 F.2d 24, 26 (1st Cir. 1986);

Rohrberg, 26 F. Supp. 2d at 309-10.  A reviewing court will not disturb a clearly articulated

credibility finding with substantial supporting evidence in the record.  See Frustaglia, 829 F.2d at

195.

A lack of a sufficiently explicit credibility finding becomes a ground for remand when

credibility is critical to the outcome of the case.  See Smallwood v. Schweiker, 681 F.2d 1349,

1352 (11th Cir. 1982).  If proof of disability is based on subjective evidence and a credibility

determination is, therefore, critical to the decision, "the ALJ must either explicitly discredit such

testimony or the implication must be so clear as to amount to a specific credibility finding."

Foote v. Chater, 67 F.3d 1553, 1562 (11th Cir. 1995) (quoting Tieniber v. Heckler, 720 F.2d

1251, 1255 (11th Cir. 1983)).

### D.   Pain

"Pain can constitute a significant non-exertional impairment."  Nguyen, 172 F.3d at 36.

Congress has determined that a claimant will not be considered disabled unless medical and

other evidence (e.g., medical signs and laboratory findings) is furnished showing the existence of

a medical impairment which could reasonably be expected to produce the pain or symptoms

alleged.  42 U.S.C. § 423(d)(5)(A).  The ALJ must consider all of a claimant's statements about

symptoms, including pain, and determine the extent to which the symptoms can reasonably be

accepted as consistent with the objective medical evidence.  20 C.F.R. §§ 404.1528, 416.928.  In

determining whether the medical signs and laboratory findings show medical impairments which

reasonably could be expected to produce the pain alleged, the ALJ must apply the First Circuit's

six-part pain analysis and consider the following factors:

> 1. The nature, location, onset, duration, frequency, radiation, and intensity of any
> pain;

2. Precipitating and aggravating factors (e.g., movement, activity, environmental conditions);

3. Type, dosage, effectiveness, and adverse side-effects of any pain medication;

4. Treatment, other than medication, for relief of pain;

5. Functional restrictions; and

6. The claimant's daily activities.

Avery, 797 F.2d at 29; Gullon v. Astrue, No. 11-cv-099ML, 2011 WL 6748498, at *5-6 (D.R.I. Nov. 30, 2011). An individual's statement as to pain is not, by itself, conclusive of disability. 42 U.S.C. § 423(d)(5)(A). Guidance in assessing the credibility of the claimant's statement is provided by the Commissioner's 1996 ruling. SSR 96-7p, 1996 WL 374186 (July 2, 1996). Credibility of an individual's statement about pain or other symptoms and their functional effects is the degree to which the statement can be believed and accepted as true; in making this determination, the ALJ must consider the entire case record and may find that all, only some, or none of an individual's allegations are credible. Id. at *4. One strong indication of the credibility of an individual's statements is their consistency, both internally and with other information in the record. Id. at *5-6.

## VI.    **Application and Analysis**

### A.    **The ALJ's Step Five Finding**

Plaintiff's Step Five challenge is a throwaway argument. He contends that this matter should be remanded because the ALJ's hypothetical to the VE asked about an individual who "would be able to lift/carry up to twenty pounds," Tr. 62, while the final RFC finding provides that Plaintiff "can lift 20 pounds occasionally and 10 pounds frequently," Tr. 24.

If the omission of "occasionally" from the hypothetical is error, it is plainly harmless. First, as the Commissioner points out, the jobs cited by the VE in response to the hypothetical

(solderer or assembler), Tr. 63, are both described in the Dictionary of Occupational Titles as requiring light exertion, which is defined as "[e]xerting up to 20 pounds of force occasionally (Occasionally: activity or condition exists up to 1/3 of the time) and/or up to 10 pounds of force frequently (Frequently: activity or condition exists from 1/3 to 2/3 of the time) and/or a negligible amount of force constantly (Constantly: activity or condition exists 2/3 or more of the time) to move objects." Dictionary of Occupational Titles § 706.684-022, 1991 WL 679050 (U.S. Dep't of Labor 1991) (assembler, small products); id. at § 813.684-022, 1991 WL 681592 (solderer).  Moreover, Plaintiff's treating chiropractor, Dr. Estner, found that Plaintiff could lift twenty pounds frequently and twenty-five pounds occasionally.  Tr. 337.  Accordingly, even if the VE had misinterpreted the ALJ's short hand reference to "up to twenty pounds," which he did not, there is no need for a remand because the evidence from Dr. Estner supports the less restrictive RFC.  See Senay v. Astrue, C.A. No. 06-548S, 2009 WL 229953, at *12 (D.R.I. Jan. 30, 2009) (remand is not necessary if it "would have no practical effect on the outcome of the case").  I do not recommend remand on this ground.

### B.    The ALJ's RFC Finding

Plaintiff contends that, in arriving at his physical and mental RFC findings, the ALJ improperly evaluated the medical evidence on his own and erroneously rejected both the opinions of the treating chiropractor, Dr. Estner, and Plaintiff's statements about his limitations.

Plaintiff's mental RFC challenge rests on the argument that the ALJ wrongly rejected the GAF score of 50 in the examining report of Dr. Turchetta and instead performed an improper lay evaluation of Plaintiff's complaints of depression.  This argument fails because the interpretation of the significance of Dr. Turchetta's findings was performed by the two experts, the SSA psychologists, Dr. Warren and Dr. Telford-Tyler.  Tr. 71-72, 96-97.  The ALJ adopted their

interpretations in finding that Plaintiff did not have a severe mental impairment; he also properly considered the evidence of Plaintiff's lack of any voluntary[10] mental health treatment, his extensive activities of daily living, and the absence of a significant description of emotional functional limitations at the hearing. Tr. 21-24. I find that the ALJ's rejection of Dr. Turchetta's GAF assessment of 50 is well supported by the opinions of the reviewing psychologists who saw the entire record.[11] Allen v. Colvin, C.A. No. 13-781L, 2015 WL 906000, at *13 n.16 (D.R.I. Mar. 3, 2015) (ALJ properly considered and rejected plaintiff's argument that significant weight should have been afforded to GAF scores based on one-time examinations because they are of limited relevance in assessing plaintiff's ability to work); Mendes v. Colvin, Civil Action No. 14-12237-DJC, 2015 WL 5305232, at *8 (D. Mass. Sept. 10, 2015) ("GAF scores must have supporting evidence to be given significant weight") (quoting Bourinot v. Colvin, Civil Action No. 14-cv-40016-TSH, 2015 WL 1456183, at *13-14 (D. Mass. Mar. 30, 2015)); Morey v. Colvin, C.A. No. 14-433M, 2015 WL 9855873, at *14 (D.R.I. Oct. 5, 2015), R. & R. adopted, C.A. No. 14-433-M-PAS, 2016 WL 224104 (D.R.I. Jan. 19, 2016) ("a GAF score is never dispositive of impairment severity because it is a snapshot opinion about the level of functioning to be considered with all the other evidence about a person's functioning") (internal quotation

---

[10] The 2006 therapy was court-ordered as a condition of probation and was discontinued after five sessions based on the therapist's opinion that Plaintiff's mood was "good" and no further treatment was necessary. Tr. 270-74.

[11] While not mentioned by the reviewing psychologists or the ALJ, it must be noted that Dr. Turchetta's clinical interview report is based on statements by Plaintiff that are contradicted elsewhere in the record. For example, Plaintiff told Dr. Turchetta that he cannot drive due to his injury, yet his Function Report said he can drive. Tr. 223. When Dr. Turchetta asked about Plaintiff's "legal involvement," Plaintiff told him that the only issue was a robbery arrest with no conviction almost twenty years prior. Tr. 310. This is false; Plaintiff was convicted of a serious assault and battery and served two and a half years for which he was on probation in 2006 and was facing a felony charge of breaking and entering at the time of the interview with Dr. Turchetta. Tr. 174, 274. In addition, Plaintiff told Dr. Turchetta a version of how he got the left leg injury that appears to be a complete fabrication – he said he hurt it severely while working on an oil rig and was currently receiving care for the leg at RIH. Tr. 309. With this much inaccurate information provided during the clinical interview, I am disinclined to second guess the ALJ's decision to adopt the SSA reviewing psychologists' interpretation of Dr. Turchetta's findings.

marks omitted).  Plaintiff points to no inconsistent evidence for the period after their file review was completed.  Plaintiff's challenge to the ALJ's mental RFC is unfounded.

Plaintiff's challenge to the ALJ's physical RFC rests on three prongs.  First, he claims that the SSA physicians reviewed the record before Plaintiff's lumbar spine was x-rayed in June 2013 and was imaged in July 2013.  See Tr. 21 (referring to x-ray at Tr. 367 and MRI at Tr. 351-52).  Second, he argues that the ALJ should have evaluated the opinion of Dr. Estner more carefully; even though Dr. Estner is a chiropractor and therefore a non-acceptable medical source, Plaintiff argues that the ALJ failed to consider the length of the treating relationship and the degree to which the Estner opinion was supported by and consistent with other evidence.  Third, Plaintiff argues that his own statements should have been found to be credible.

None of these arguments is compelling.

As to the first, Plaintiff is right that the reviewing experts did not see the June 2013 x-ray or the July 2013 MRI of the lumbar spine.  However, the ALJ committed no error in his treatment of this new evidence.  For starters, as the ALJ correctly noted, the medical interpretation of the June 2013 lumbar spine x-ray is unambiguous: "normal examination," Tr. 366; consistently, the Kent Hospital staff who ordered and reviewed the x-ray interpreted it as "LS spine: neg."  Tr. 365-67.  Similarly, while the July 2013 MRI revealed disc bulges with mild multilevel central stenosis, a left lateral L3-4 annular tear, and mild foraminal narrowing, Tr. 351-52, Dr. Jones interpreted this MRI and noted "no disc issues"; her EMG testing included an examination of Plaintiff's lumbar spine and she found the results to be "relatively unremarkable."  Tr. 359.  She recommended no treatment except for a low dose of Gabapentin and follow-up in two to three months.  See id.  The only lumbar spine treatment in the record is Dr. Estner's conservative course of chiropractic care from June to August 2013, which ended

with the recommendation that Plaintiff follow up with his RIH orthopedist.  Plaintiff did so, returning to Dr. Hsu, whose last note, dated October 23, 2013, makes no referral or notation about Plaintiff's back.  Rather, it states only that the left foot is fully recovered and the right ankle permits ambulation without assist; Dr. Hsu prescribes no medication, orders no treatment and discontinues care.  Tr. 438-39.  Cumulatively, these records amount to substantial evidence supporting the ALJ's conclusion that the medical evidence failed to demonstrate that the impairment of Plaintiff's lumbar spine was sufficiently severe as to significantly impair his ability to engage in basic work for twelve continuous months.  Tr. 21.

Plaintiff's second basis for attacking the ALJ's physical RFC – that the minimal weight afforded to Dr. Estner's opinion clashes with the requirement that a non-acceptable source should be considered if the treating relationship is longstanding and the opinion is well supported and consistent with the other evidence in the record – founders on the profound inconsistency between Dr. Estner's opinion and all of the contemporaneous treating evidence from Kent Hospital, Dr. Jones and Dr. Hsu.  To note just one example, on June 28, 2013, Dr. Estner opined that Plaintiff had "[a]cute lumbosacral sprain/strain," Tr. 339; this contrasts with the Kent Hospital finding of two weeks prior that Plaintiff's lumbar spine was normal and that the bike collision had caused "no acute disease."  Tr. 365.  This evidence is more than sufficient to provide a proper evidentiary foundation for the ALJ's decision to afford the Estner opinion minimal weight.  See Morey, 2015 WL 9855873, at *17 (no error in ALJ's rejection of non-acceptable source opinion inconsistent with other evidence, including treatment history); Ferrazzano-Mazza v. Colvin, CA No. 14-239 ML, 2015 WL 4879002, at *17 (D.R.I. Aug. 14, 2015) (no error in ALJ's rejection of non-acceptable source opinion inconsistent with overall record).

The final task is to address Plaintiff's argument that the ALJ erred in discounting his credibility. Here too, there is no error. While Plaintiff is right that the factors in SSR 96-7p should guide the ALJ's credibility determination, his challenge fails because that is exactly what the ALJ did. Specifically, he noted the lack of any evidence to support the claim of disability based on meningitis, he reviewed Plaintiff's many daily activities as described in one or the other of the two Function Reports, and he carefully considered the opinions of acceptable medical treating sources that the left foot was fully healed and the right ankle had largely healed, leaving residual weakness but permitting ambulation. Tr. 25. The ALJ noted that these conditions had not deterred Plaintiff from biking, resulting in the June 2013 collision. And the ALJ carefully examined the post-collision evidence, including the Kent Hospital finding that the incident did not result in any "acute disease," as well as the records of Dr. Jones and Dr. Hsu finding Plaintiff was able to ambulate without any assists and was not in need of any continued treatment beyond a low dose of medication. Tr. 26, 26 n.9. Mindful of the deference to which the ALJ's credibility determination is entitled, Frustaglia, 829 F.2d at 195, I find these reasons more than sufficient to buttress the ALJ's adverse credibility finding. It is worth noting that the ALJ's adverse credibility finding is not only properly buttressed by appropriate reasons that are well supported by substantial evidence, but also is corroborated by the remarkable array of Plaintiff's inconsistent statements as laid out in this report and recommendation, as well as by the adverse credibility findings by the medical experts at both the initial and reconsideration phases. Tr. 72, 98. The ALJ's rejection of Plaintiff's statements as "not entirely credible" does not constitute error. Tr. 25

To summarize, other than Dr. Estner's discredited opinion and Plaintiff's own incredible statements, Plaintiff does not point to any evidence establishing that his back pain, left leg, or the

Achilles rupture in his ankle caused greater limitations than the ALJ assessed.[12]  I find no error

in the ALJ's physical RFC finding.

## VII.   Conclusion

Based on the foregoing, I recommend that Plaintiff's Motion to Reverse the Decision of

the Commissioner (ECF No. 11) be DENIED and Defendant's Motion for an Order Affirming

the Decision of the Commissioner (ECF No. 12) be GRANTED.  Further, and only if this Court

does not adopt my recommendation but remands the matter for further consideration, I

recommend that the remand include a directive that further consideration should be given to

whether any of the allegedly disabling impairments are felony-related.

Any objection to this report and recommendation must be specific and must be served

and filed with the Clerk of the Court within fourteen (14) days after its service on the objecting

party.  See Fed. R. Civ. P. 72(b)(2); DRI LR Cv 72(d).  Failure to file specific objections in a

timely manner constitutes waiver of the right to review by the district judge and the right to

appeal the Court's decision.  See United States v. Lugo Guerrero, 524 F.3d 5, 14 (1st Cir. 2008);

Park Motor Mart, Inc. v. Ford Motor Co., 616 F.2d 603, 605 (1st Cir. 1980).


/s/ Patricia A. Sullivan
PATRICIA A. SULLIVAN
United States Magistrate Judge
September 15, 2016

---

[12] While not challenged by Plaintiff, it bears noting that there is no error in the ALJ's incorporation of more
limitations in his RFC determination than the SSA reviewers included in their opinions.  See Morris v. Astrue, C.A.
No. 11-625S, 2013 WL 1000326, at *16 (D.R.I. Feb. 1, 2013), adopted sub nom., Morris v. Colvin, 2013 WL
997132 (D.R.I. Mar. 13, 2013) (when ALJ assigns RFC more restrictive than evidence warranted, any error is
harmless).